# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANTOINE SAVINE, | : | CIVIL ACTION NO. |
| Petitioner, | : | |
| v. | : | |
| | : | |
| INTERACTIVE BROKERS LLC, | : | |
| Respondent. | : | NOVEMBER 9. 2018 |

## PETITION TO VACATE

Petitioner, Antoine Savine ("Savine" or "Petitioner") submits this Petition to vacate an award issued under the rules of the London Court of International Arbitration ("LCIA") with respect to an arbitration proceeding between Petitioner and Interactive Brokers LLC ("Interactive" or "Respondent"), and alleges as follows:

### A. INTRODUCTION

1. This petition follows an August 24, 2018 award by a non-U.S. arbitrator in a brokerage dispute between Respondent, a U.S. federally-regulated Futures Commission Merchant ("FCM") domiciled and headquartered in the State of Connecticut, and Petitioner, its retail customer. Interactive filed the claim in an attempt to collect the sum of US $631,002.88 which it accounted as margin deficit in Savine's retail foreign exchange ("Retail Forex") trading account. Interactive maintained that Savine had failed to pay the deficit without any lawful excuse. Savine did not dispute that Interactive had a general right to liquidate his position but maintained that the resulting deficit had been wrongfully magnified by Respondent's commercially unreasonable mishandling of the transaction in contravention of its duties under applicable U.S. federal law and

1

regulation. (See Statement of Claim attached as <u>Exhibit 1</u> and Response attached as <u>Exhibit 2</u>).

2. Respondent argued that the boilerplate "Interactive Brokers LLC Customer Agreement" (the "Customer Agreement" attached hereto as <u>Exhibit 3</u>) drafted by Respondent controlled Interactive's duties with respect to the liquidation transaction. Respondent emphasized that the Customer Agreement states in its "Miscellaneous" section that "[t]his Agreement is governed by the laws of the State of Connecticut." (Ex. 3, par. 32).

3. However, Petitioner argues that (i) Interactive provided notice to Savine before opening the account that as a U.S. federally registered and regulated broker its conduct was at all times fully subject to applicable federal law and regulation (as indeed it was),[1] (ii) the Customer Agreement repetitively confirmed that its terms were similarly subject,[2] and (iii) to the extent standards of care under Connecticut law conflict with any applicable higher standard mandated by federal law and regulation, the state law would be pre-empted.

4. The arbitrator agreed with Petitioner that federal commodities law and regulation applied. (Final Award attached as <u>Exhibit 4</u> herein the "Award"). As set forth in the specific findings of the Award, she correctly determined that Interactive, as a U.S. Commodity Futures Trading Commission ("CFTC") registrant and National Futures Association ("NFA") member, was at all relevant times fully subject to U.S. federal law as embodied in the U.S. Commodity Exchange Act ("CEA") as well as CFTC

---

[1] "All transactions are subject to…applicable laws and regulations" Customer Agreement Section 6; "Subject to all laws and regulations, Customer authorizes [Interactive] to execute proprietary trades of [sic] itself and its affiliates… " *Ibid*. Section 8; "Margin transactions are subject to…requirements…of regulators…"; *Ibid*. Section 11
[2] https://www.interactivebrokers.com/en/index.php?f=302

regulations and NFA Compliance Rules promulgated and mandated thereunder.[3] In particular, the arbitrator properly held that the provisions of NFA Rule 2-36(c) applied to Respondent's decision to liquidate Savine's account and its conduct in doing so (Ex. 4. pg. 47). NFA Rule 2-36(c) constitutes and imposes a specific and high standard of care: it requires NFA Forex Dealer Members (like Respondent) and their Associates to "observe high standards of commercial honor and just and equitable principles of trade in connection with their Retail Forex business."[4] In published interpretive documents, the NFA Board has stated that the Rule was enacted to ensure that a Retail Forex dealer "acts honestly, fairly and *in the best interests of its customers*."[5] [Emphasis added].

5.  Nonetheless, the arbitrator, in manifest disregard of the very provisions of law and regulation she herself found to apply, proceeded to overlay a different standard. Citing to Connecticut state case law she took the position that in liquidating Savine's account Interactive was *not* required to "observe the highest standards of commercial honor," or to act "in the best interests of its customers" as mandated by NFA Rule 2-36(c). Instead, she inexplicably concluded that Interactive's conduct was proper merely because she found insufficient evidence that it had acted with a "sinister motive."

---

[3] *See* 7 U.S.C. § 21(b)(7) (Registered futures associations) requiring that NFA rules be "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, in general, to protect the public interest... ."
[4] NFA Compliance Rule 2-36 – Forex Transactions."
[5]  https://www.nfa.futures.org/news/PDF/CFTC/IntNotc_CR2-36_Forex_Price_Changes_0811.pdf, NFA proposal for Interpretive Guidance to NFA Rule 2-36: "…NFA Compliance Rule 2-36(c) requires an FDM to observe high standards of commercial honor and just and equitable principles of trade in the conduct of its forex business. NFA's Board of Directors (Board) adopted these provisions ***to ensure that an FDM acts honestly, fairly and in the best interests of its customers****…. .*" [Emphasis added].

6. It is respectfully submitted that the inconsistency in the arbitrator's final award indicates a manifest disregard of the law and is subject to vacatur for that reason, as well as in the interests of public policy.

B. **BACKGROUND**

7. The arbitration was conducted pursuant to the Interactive Brokers Futures Arbitration Agreement dated November 29, 2011 (the "Arbitration Agreement") (Exhibit 5). The Arbitration Agreement provides:

> *"Any controversy or claim between Interactive Brokers LLC ("IB") and the undersigned ("Customer") arising out of or relating to Customer's Account with IB, to transactions between IB and Customer, to the Customer Agreement with IB or any other agreement between IB and Customer, or to the breach of any such transaction or agreement shall, except as provided below, be resolved by arbitration before a forum chosen in accordance with the procedure set out below… Any award rendered in any arbitration conducted pursuant to this agreement shall be final, binding and enforceable in accordance with the laws of the State of Connecticut and judgment may be entered on any such award by any court having jurisdiction thereof.*
>
> *At such time as Customer notifies IB that Customer intends to submit a controversy to arbitration, or at such time as IB notifies Customer that IB intends to submit a controversy to arbitration, Customer will have the opportunity to choose a forum from a list of qualified forums provided by IB. A "qualified forum" is an organization whose procedures for conducting arbitrations meet Acceptable Practices established by the Commodity Futures Trading Commission ("CFTC"). In connection with this Arbitration Agreement, IB is required to furnish to Customer the following statement, pursuant to Rule 166.5 of the CFTC (for the purposes of the following, "you" or "your" means IB's Customer):*
>
> THREE FORUMS EXIST FOR THE RESOLUTION OF COMMODITY DISPUTES: CIVIL COURT LITIGATION, REPARATIONS AT THE COMMODITY FUTURES TRADING COMMISSION ("CFTC"), AND ARBITRATION CONDUCTED BY A SELF-REGULATORY OR OTHER PRIVATE ORGANISATION.
>
> THE CFTC RECOGNIZES THAT THE OPPORTUNITY TO SETTLE DISPUTES BY ARBITRATION MAY IN SOME CASES PROVIDE MANY

> *BENEFITS TO CUSTOMERS, INCLUDING THE ABILITY TO OBTAIN AN EXPEDITIOUS AND FINAL RESOLUTION OF DISPUTES WITHOUT INCURRING SUBSTANTIAL COSTS. THE CFTC REQUIRES, HOWEVER, THAT EACH CUSTOMER INDIVIDUALLY EXAMINE THE RELATIVE MERITS OF ARBITRATION AND THAT YOUR CONSENT TO THIS ARBITRATION AGREEMENT BE VOLUNTARY.*
>
> *BY SIGNING THIS AGREEMENT, YOU: (1) MAY BE WAIVING YOUR RIGHT TO SUE IN A COURT OF LAW; AND (2) ARE AGREEING TO BE BOUND BY ARBITRATION OF ANY CLAIMS OR COUNTERCLAIMS WHICH YOU OR IB MAY SUBMIT TO ARBITRATION UNDER THIS AGREEMENT. YOU ARE NOT, HOWEVER, WAIVING YOUR RIGHT TO ELECT INSTEAD TO PETITION THE CFTC TO INSTITUTE REPARATIONS PROCEEDINGS UNDER SECTION 14 OF THE 8 COMMODITY EXCHANGE ACT WITH RESPECT TO ANY DISPUTE WHICH MAY BE ARBITRATED PURSUANT TO THIS AGREEMENT…*
>
> *YOU NEED NOT SIGN THIS AGREEMENT TO MAINTAIN AN ACCOUNT WITH IB. HOWEVER, DECLINING THIS AGREEMENT MAY RESULT IN REDUCED TRADING LIMITS…*

8. In accordance with the Arbitration Agreement and the procedure provided in 17 CFR §166.5, Interactive Brokers gave notice by letter dated November 17, 2016 of its intention to submit the dispute to arbitration. In the same letter, Interactive Brokers identified four organizations whose procedures it claimed satisfied the CFTC's Acceptable Practices, including the LCIA. On December 23, 2016, over objection, Savine's attorney elected, without prejudice to his right to challenge the submission to arbitration, to have the matter heard by the LCIA.

9. In addition to the Arbitration Agreement, the Customer Agreement provided the terms under which Savine maintained his account. It is undisputed that a number of provisions contained in the Customer Agreement were set forth as mandated by CFTC regulations. The Customer Agreement contained the following relevant provisions:

> 19. Foreign Currency Exchange ("Forex") Transactions:

5

> A. HIGH RISKS OF FOREX TRADING: FOREX TRADING IS GENERALLY UNREGULATED, IS HIGHLY RISKY DUE TO THE LEVERAGE (MARGIN) INVOLVED, AND MAY RESULT IN LOSS OF FUNDS GREATER THAN CUSTOMER DEPOSITED IN THE ACCOUNT. Customer represents that he or she has read and acknowledges the "Risk Disclosure Statement for Forex Trading and Multi-Currency Accounts" provided separately by IB.
>
> B. For Forex transactions, IB generally will act as agent or riskless principal and charge a fee. IB may effect Forex transactions through an affiliate or third party, which may profit or lose from such transactions. Customer agrees that IB may transfer to or from Customer's regulated futures or securities account(s) from or to any of Customer's non-regulated Forex account any funds or assets that may be required to avoid margin calls, reduce debit balances or for any other lawful reason.
>
> C. Netting: (i) Netting by Novation. Each Forex transaction between Customer and IB will immediately be netted with all then existing Forex transactions between Customer and IB for the same currencies to constitute one transaction. (ii) Payment Netting. If on any delivery date more than one delivery of a currency is due, each party shall aggregate the amounts deliverable and only the difference shall be delivered. (iii) Close-Out Netting. If Customer: (a) incurs a margin deficit in any IB account, (b) defaults on any obligation to IB, (c) becomes subject to bankruptcy, insolvency or other similar proceedings, or (d) fails to pay debts when due, IB has the right but not the obligation to close-out Customer's Forex transactions, liquidate all or some of Customer's collateral and apply the proceeds to any debt to lB. (iv) Upon Close-Out Netting or any "Default", all outstanding Forex transactions will be deemed terminated as of the time immediately preceding the triggering event, petition or proceeding. (v) IB's rights herein are in addition to any other rights IB has (whether by agreement, by law or otherwise).

The foregoing language is required by CFTC regulations in all Retail Forex customer agreements. The arbitrator also noted that although Interactive was fully subject to CFTC Regulation and NFA Rules (including NFA Rule 2-36), its conduct was not specifically violative of CFTC Rule 5.18 . (Ex. 4, pg. 46).

10. Interactive was at all relevant times registered with the CFTC as a Futures

        Commission Merchant and was a Forex Dealer Member of NFA. It is also subject to securities regulation by the Financial Industry Regulatory Authority ("FINRA") and the US Securities and Exchange Commission ("SEC").

11. When Savine opened his account with Interactive Brokers in November of 2011, he executed the Customer Agreement. The Customer Agreement allowed Savine's obligation to monitor his account. Interactive has emphasized that, if Mr. Savine failed to ensure that his account had sufficient equity to meet margin requirements, Interactive Brokers would be entitled in its sole discretion – but not obliged – to liquidate some or all of his positions.

12. Savine was provided a "Risk Disclosure" statement at the time he opened his account which it was later discovered was not the version required under CFTC Regulations. The correct risk disclosure statement was not provided until after the margin loss.

13. Interactive internally classified Savine as a "knowledgeable" client and a "good credit-risk" (Ex. 1, par. 4, 21, 22, 23). Petitioner argued that the fact that Interactive perceived him as more creditworthy or knowledgeable than the average Retail Forex client did not relieve it of its statutory and regulatory duties. It is uncontested that Savine was and is a Retail Forex customer, and not a high net worth or institutional client as defined by 7 U.S.C. § 1a(18)[6] (T1. 68, line 14).[7] In opening his account, he

---

[6] 7 U.S.C. § 1a(18) defining an "Eligible Contract Participant."
[7] References refer to Official Transcript of Arbitration annexed in two parts as <u>Exhibit 6</u> and <u>Exhibit 7</u>. Day 1 is referred to as T1 and Day 2 as T2.

therefore expected and was fully entitled to all of the protections afforded Retail Forex clients under the CEA,[8] CFTC Regulations[9] and NFA Rules.[10]

14. Interactive publically represented itself as a "direct market access" broker. Under section 19 of the Customer Agreement titled "Foreign Currency Exchange ("Forex") Transactions," Interactive represented that "[f]or Forex transactions, [Interactive] generally will act as agent or riskless principal and charge a fee." It claimed it provided an "execution-only" trading platform for traders to trade products on numerous markets and exchanges, including foreign exchange. Interactive made contradictory assertions that it was the counterparty to the client in "clearing" but maintained that they were not the counterparty in "trading" (T1. 112, line 4). Interactive stated that it does not provide trading advice or recommendations, nor does it undertake discretionary trading on behalf of its clients, but that all trading and account management is directed by the customer.

15. Contrary to Interactive's attempts to color the dispute as a "wrongful liquidation" issue, Savine is not complaining of the fact that Interactive liquidated his account, but of the manner in which the liquidation was conducted. His defense centers on the fact that Interactive's conduct was in violation of its statutory and regulatory standard of duty to Savine as a Retail Forex customer.

**FACTS RELATING TO THE ACCOUNT DEFICIT**

16. The deficit which occurred to Savine's margin account was initially triggered by an

---

[8] 7 U.S.C. § 2(c)(2)(B) *et seq*. ("Agreements, contracts, and transactions in retail foreign currency").
[9] 17 CFR Part 5.
[10] NFA Forex Dealer Member (FDM) Regulatory Obligations https://www.nfa.futures.org/members/fdm/regulatory-obligations/index.html

unexpected market adjustment caused when the Swiss National Bank (the **"SNB"**) unexpected lifted its controls on the rate of the Swiss Franc ("CHF") against the Euro ("EUR") on January 15, 2015 (referred to herein as the **"Swiss Franc incident"**).

17. The facts surrounding the incident were set forth in each of the market expert reports submitted on behalf of the parties.[11] Essentially, from September 6, 2011, the SNB had adopted a so-called "peg" to the EUR whereby the SNB would defend a minimum exchange of CHF 1.20 per EUR. Due to this currency peg the EUR/CHF was generally perceived as a low risk currency. SNB had in a quarterly report published in December 2014 insisted on defending the currency peg with the "utmost determination." Interactive allowed its customers very high leverage of up to 1:40 on the EUR/CHF currency cross, which further evidences that IB perceived the risk to be very low. At the high maximum leverage offered by Interactive of 1:40, a jump of just 2.5 % would generate a negative balance. Interactive authorized and encouraged such high leverage trading because its own revenue arose directly from transactional volume.

18. On the date of the SNB Event, Savine was trading prudently out of a well-capitalized account. While Interactive made much more leverage available, Savine elected to use leverage of only 1:10—a mere quarter of what Interactive authorized. At 1:10, it would have taken an adverse price move of more than 10%, more sizeable than anything in recent history prior to 2015, to produce a negative balance. (Ex. 2, par. 8)

19. The SNB Event sent hundreds of client accounts into negative balance. Immediately

---

[11] Exhibits 11 and 12.

following the incident Interactive turned off its auto liquidation feature (T. 90, line 17, T. 99, Line 7) and at its own discretion began to manually liquidate certain client accounts. There was evidence that Interactive was taking the amount of net liquidation value of each account into consideration, liquidating only deficit accounts with negative balances of $50,000 or less. (T. 111, lines 7-11). There was testimony that at least one customer tried to issue an order to liquidate his account on his own during the crisis but was not permitted to do so (T.115, line 16).

20. In Savine's case, certain of his smaller positions were liquidated prior to his larger CHF/EUR position—the exposure directly affected by the SNB Event. (T1.127, line 13). According to Interactive it did not liquidate larger positions sooner due to a lack of liquidity, and the fear that larger orders would put additional liquidity pressure into the market (T1.127, line 13-17). (Relevant portions of the Transcript are attached hereto as <u>Exhibit 5</u>). But this assertion is directly contradicted by Interactive's own press release published shortly after the SNB event, in which it boasted that "***deep liquidity was significant during the Swiss franc trading crisis*** in January 2015. While many FX competitors faced policy or technology-driven interruptions, ***IB fared no disruption to its price quotes during the violent movement for the Swiss franc, with the exception of a 3 minute period immediately following the announcement by the SNB***""[12]

21. The same press release alleges that Interactive had "no conflict of interest with its clients as it provides prices received directly from its counterparties." But as noted below and in the Statement of Defense, this assertion is also contradicted by

---

[12] Interactive Brokers Press Release, July 13, 2015, Exhibit 14.

transaction statements provided by Interactive in discovery. Ultimately, a number of Savine's liquidating trades were not transacted against counterparties but matched against the books of Interactive's own branch offices and affiliates.[13]

22. As many other FX clients, Savine's EUR/ CHF position caused him to suffer losses as the value of the Euro declined against the Swiss Franc. He first checked his account on Interactive's online system 20 minutes after the SNB incident (T1.159, line 13-14). Savine testified that the market was moving quickly but if he had been liquidated timely the market price could have been as high as 1.15, thereby causing a much lower deficit in his account (T1.161-162, lines 21-25, 1-9). In response to a question as to whether Savine knew he hadn't been liquidated on the 15th, Savine testified:

> A. *I knew that – I suspected it was the case during the flash crash. I didn't understand why they didn't liquidate immediately after the flash crash and a few hours later, when they liquidated my other positions and then I realized that they kept this one, I could make sense of it. So I thought it's probably liquidated too. I just can't see it yet.* (T1.176, lines 16-24).

Further, Savine testified:

> A. *No that's what I thought. I thought something was wrong with the system, there had been something wrong all day and I thought there was something wrong because it didn't make any sense to me. Why would anybody do that? Why would anybody in their right mind liquidate everything except the biggest riskiest position? It doesn't make any sense.* (T1. 177, lines 5-11).

More than 30 hours later, on January 16, 2015, Interactive finally reported the liquidation of Savine's EUR/CHF position. Respondent priced the sale at a rate of

---

[13] Brian Griffin market expert report Exhibit 13.

11

0.9854054. The deficit on the account following liquidation was equivalent to $669,154.61 as shown on the account statement as at the close of business on January 16, 2015. [14]

23. At the time of the SNB Event in addition to his larger long EUR/CHF Savine held other smaller positions, which Interactive elected to liquidate within 4 hours after the event. But for reasons still not explained, Interactive kept the largest, riskiest EUR/CHF position open until January 16, 2015 at 15:53:36 GMT[15]— *more than 30 hours after the SNB Event*.

24. In February 2015, Interactive Brokers converted the negative balance on Mr. Savine's account from CHF into US Dollars (being the base currency of the account) as shown on the Monthly Account Statement for February 2015 (Relevant account statements are attached as Exhibit 8). Because of changes in the USD/CHF exchange rate between January 16th and February 10, 2015, the deficit on Mr. Savine's account was reduced to US$631,002.88. This amount was claimed by Interactive in its Statement of Claim, along with interest, costs and attorney's fees.

25. The vast majority of compliant CFTC-registered, NFA-member retail FX merchants, in significant part due to the urging of U.S. regulators, determined to forgive and zero their Retail Forex customers' negative balances. Interactive was the exception, as this dispute demonstrates.

## ARBITRATION

---

[14] Interactive Brokers also liquidated Mr Savine's CAD/CHF, USD/CHF and AUD/JPY positions on 16 January 2015. Mr Savine held much smaller positions in other currencies, which were closed during January and February as shown on the Monthly Account Statements for January 2015 and February 2015 (Exhibit 6).

[15] Statement of Claim, para. 85

26. The arbitration was conducted under the rules of the LCIA in London between April 16th and 17th, 2018 before a sole arbitrator, Eva Kalnina. As required by the Customer Agreement and the Arbitration Agreement, U.S. law was held to apply. Both parties submitted witness statements (Attached hereto as <u>Exhibit 9</u> and <u>10</u>). Expert briefs related to US law were submitted by both parties. (<u>Exhibit 11</u> and <u>12</u>).

27. Claimant's expert, Ronald Filler ("Filler"), took the position that neither CFTC regulations or NFA rule 2-36 applied to the liquidation of Savine's account (Ex. 9, pg. 29) (T1. Pg. 239, line 10-12). Filler is not admitted or qualified to practice law in Connecticut. Nonetheless, he testified that under Connecticut State law the standard of care applicable to Interactive's liquidation of Savine's account was a level of bad faith requiring the finding of a dishonest purpose or "sinister motive" (T1. 222, lines 3-6). Short of that, according to Filler's opinion, the contract gave Interactive unchallengeable discretion as to "when to liquidate, the timing of that liquidation, as well as to the manner…" (T1. 225, line 18-20). In addition Filler testified,

> Once the trade is put on or taken off by the customer, NFA rule 2-36 does apply. Once it's put on by the customer and then the customer fails to meet his financial obligations, meaning because of the debit balance, those rules do not apply at all to the contract terms providing for the discretion of the liquidation of those trades.

When pressed, Filler's position became ambiguous. He was asked the question "[s]o it is your position that IB had the ability to disregard compliance obligation under CFTC regulation and NFA rules by the drafting of contract language in its customer agreement?" His response was "I don't know of any law or any regulation that deals with the contract provisions of a customer agreement. So to answer your question, I

don't understand it." (T1. 243, lines 24-25, lines 3-5).

28. Martin Doyle ("Doyle") provided an expert report on behalf of Savine. Doyle opined that contrary to Filler's assertion, CFTC Regulation 5.18 and NFA Rule 2-36 did apply to the liquidation involving Savine's account (Ex. 11, pg. 9). In addition, he pointed out that Connecticut State law (Conn. Gen. Stat. Section 42a-9-610) specified a standard of "commercial reasonableness" (Ex. 11, pg. 13). Doyle testified that if Connecticut law were to apply, Interactive would still have had a duty to liquidate in a commercially reasonable manner. (T2. 7, lines 12-14). Doyle testified:

> A. Margin requirements are primarily intended to protect the brokerage firm but that's not the sole purpose. They are also meant to protect the other customers of the brokerage firm who aren't under the margin call and the purpose of that, the public purpose of that, is to ensure that one account that goes south, and possibly in a big way, doesn't take down an entire brokerage firm and thereby putting all the customers' assets at risk. So the margin policies are primarily for the protection of the other customers of the brokerage firm and brokers have broad latitude in these situations to exit markets. *It doesn't mean they don't have any duties to the customer who is under margin. Those duties don't go away.* [Emphasis Added].

Doyle was questioned extensively regarding the case he relied upon, *Kaplan v. Merrill Lynch* (citation omitted) and he maintained that commercial reasonableness was the standard involved in liquidation. (T2. 24-26). In response to cross examination regarding the "dishonest intent" and "sinister motive" language in *Caires v. JP Morgan* (the case upon which Filler relied—citations omitted), Doyle noted "No. I think *Kaplan* goes further. It talks about commercial reasonableness. This [*Caires*] doesn't. This case [*Caires*] doesn't involve federally regulated activity. The

case does not involve futures or derivative trading. The case stands for what you say it does, I grant you that point, but I don't believe it's applicable to the—to the matter before us." (T2. 35, lines 5-11).

With respect to the application of NFA Rule 2-36, Doyle stated the following:

> Everyone agrees that these rules apply to [Interactive]. Everyone agrees, on its fact, 2-36 applies to Forex trading and Forex transactions. The liquidation of Mr. Savine's account was undeniably a Forex transaction. The rule applied—the rule certainly applied while Mr. Savine had his account from November 2011 to January 15th of 2015. I understand it's [Interactive]'s position that the rule—the effect of the rule was suddenly suspended when accounts go under margin. Accounts going into an under margin situation is a very, very common occurrence for a futures or derivatives broker because the average margin requirements are between 1 and 5 percent of the value of the contract. It happens every day… It doesn't suspend the customer/broker relationship… To say they suddenly don't apply, I have never heard that before and certainly there has been no authority cited for that.

In addition, Doyle testified to the following:

> 5 Q…what is the provision of federal law that states that
> 6 federal law governs matters of contract or governs any
> 7 matter of contract?
> 8 A. Well, financial services activities in the United States
> 9 are governed by federal law. We know that. And when
> 10 you have disputes like the situations about a broker's
> 11 conduct with the customer, the federal laws, including
> 12 the CFTC regs and the NFA rules are applied to those
> 13 analyses. They are part of the analysis.

(T2, 31, lines 4-13). Doyle ended his testimony by stating that he did not agree with the position that NFA 2-36 does not apply when liquidation occurs. (T2. 60-61, lines 15-25, lines 1-25).

29. In addition, each party submitted market expert reports. Interactive's market expert was George Dowd (Exhibit 12). He opined that "[i]n light of the events of January 15, 2015 it is my opinion that [Interactive]was right to be concerned about the potential impact which liquidations of its EUR/CHF positions could have had on the market, and it was prudent to undertake those liquidations (especially of larger positions) in the manner [Interactive]did." (Ex. 12, pg. 18).

30. Savine submitted a report by Brian Griffin (Attached hereto as <u>Exhibit 13</u>). Griffin's report included the following statements:

> 25. In its statement of claim, [Interactive] extrapolates this notion into a general defense: it implies that because it used a DMA model, [Interactive] could not have benefitted, directly or indirectly from its decision to hold Mr. Savine's EUR/CHF position open for thirty hours. It then asks the arbitrator to make the logical leap to assume that any motive [Interactive] may have had in doing so must have been in good faith, and not in contravention of its duties of just treatment of its Retail Forex client.
>
> 26. My principal difficulty with [Interactive]'s "DMA" representations is that they are not true. [Interactive]'s statement of claim, like its public advertising and client notices on the subject, changes the nature and significance of its "DMA" platform in a number of ways. Firstly, it is essential to clarify that neither "DMA," "STP," nor any other operational policy or model of order routing has *any* compliance or regulatory significance referenced in CFTC Regulations or NFA Rules. The claimed use of a "DMA" model, therefore, in my professional opinion provides [Interactive] no basis to disclaim its duties to its Retail Forex clients.
>
> 27. Furthermore, an examination of disclosure materials, supported by [Interactive]'s own updated Risk Disclosure Statement, makes it clear to me that [Interactive] did *not* at all times operate in an "STP" or riskless principal manner. Many of the trades from the liquidation spreadsheet were *not* matched against independent third-party liquidity providers,

>but were internally priced by, and matched against, direct branches and affiliates of [Interactive].

(*Id.* at par. 25-27).  Griffin provided a number of reasons why Savine's liquidation 30 hours after the SNB occurred was to Interactive's actual or potential benefit, stating "all orders were passed in the name of Interactive Brokers, USA. IB remained at all times the legal counterparty to both sides of the transaction, and both the client and hedge legs of matched trades were conducted for and on behalf of IB. …..Given these facts, a Retail Forex client like Mr. Savine should not be penalized simply because Interactive Brokers chose not (as per their expert witness) to liquidate their position with one or more of IB's prime banking relationships." (Ex. 11, par. 56-58).

31. Each of the parties and experts testified at the arbitration.

### FINAL AWARD

32. During the arbitration Interactive had claimed the CFTC regulations and NFA rules did not apply to liquidation of a margin account and that it did not owe a fiduciary duty to Savine.  Savine had contested this, arguing, *inter alia*, that NFA Rule 2-36 did in fact apply, and that Interactive violated its duty to exercise commercial reasonableness and good faith in falling short of the standards contained in that Rule.

33. Despite the contrary assertions of Interactive's U.S. legal expert Filler, the arbitrator agreed with Savine and held that NFA Rule 2-36 ("Just and Equitable Principals of Trade") did indeed apply to Interactive's duties as relating to its conduct in liquidating his account (Ex. 4, pp. 46-47, pars. 170, 172, 173), requiring Interactive to

"observe high standards of commercial honor and just and equitable principles of trade in the conduct of [its] forex business."[16]

34. The arbitrator also declined to credit Filler's assertion that even if the high standards of NFA Rule 2-36 applied to Interactive's conduct in the liquidation, because no explicit statutory right of private action existed under the Rule, Interactive was free to violate it without civil liability. She stated that "the NFA Rules cannot be disregarded to the extent they contain provisions relevant to the facts of this case." (Exhibit 4, p. 46, par. 170).

35. Inexplicably however, despite these findings the arbitrator turned to Filler's representations of Connecticut state law, and from it derived a far more lax standard. Expressing an undefined and unsupported belief that NFA Rule 2-36 "alone is insufficient to support Respondent's overall position" (Exhibit 4, pp. 46-47), the arbitrator held that while the general standard of "commercial reasonableness" applied (as Savine's expert Doyle had stated), a finding of commercial "unreasonableness" did not lie absent a showing of a "dishonest or sinister motive" (Exhibit 4, p. 49, par. 181). In connection with this contradictory ruling, the arbitrator appeared to accept Filler's interpretation of the Connecticut case *Caires* v. *JP Morgan* Chase *Bank,* NA, 880 F.Supp.2d 288 (2012). (Exhibit 4, p. 48, par 177-178).

36. The arbitrator interpreted as well, the cases *In Re Kaplan*[17] and *Batchelar v Interactive Brokers*. The *Batchelar* case, the arbitrator noted, was then on appeal and has since had a decision issued by the Second Circuit vacating in part the lower

---

[16] *Ibid.,* fn. 6.
[17] *In* Re *Kaplan,* 143 F.3d 807 (3rd Cir. 1998), §16, MD-4.

Court's decision. [18] In vacating a portion of the decision, the Court noted that the negligence portion of the complaint should not have been dismissed.

37. In the end, despite clearly supporting its application and relevance, the arbitrator opted not to hold it commercially unreasonable for Interactive to fall short of its regulatory obligation to observe high standards of commercial honor and to act justly and equitably in its execution of transactions for its Retail Forex customers under NFA Rule 2-36(c). Instead, merely because she was unsatisfied as to a showing of a sinister or dishonest motive, she held it permissible for Interactive to wholly disregard its regulatory obligation to act at all times in "the best interests of its customers."[19] (Exhibit 4, pg. 49-51).

38. The arbitrator awarded Interactive its full stated deficit of $631,002.88, interest to the Interactive on the amount of $631,002.88 from January 16, 2015 until the actual payment of the amount owed at margin interest rates, and legal costs, in an amount quantified at $302,170.

---

[18] Batchelar v. Interactive Brokers,
[19] *See* fn. 7.

WHEREFORE, Petitioner respectfully requests that the Arbitration Award be vacated in its entirety.

Respectfully Submitted,

PETITIONER ANTOINE SAVINE

/s/  Terence J. Gallagher
Vivian Rivera Drohan
Drohan Lee LLP
575 Madison Avenue
New York, New York 10022
(212) 710-0004
vdrohan@dlkny.com
Pro Hac to be filed

And

Terence J. Gallagher (ct22415)
Nemchek & Poeschl, LLC
60 Long Ridge Road, Suite 202
Stamford, CT 06902
(203) 316-8277
Fax: (203) 316-8533
tgallagher@n-plaw.com

Attorneys for Petitioner